IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

PATRICIA SHUE,
     Plaintiff,

vs.                        Case No.: 3:18cv512/LAC/EMT

ANDREW SAUL,
Commissioner of Social Security,[1]
     Defendant.
_____/

## <u>ORDER, REPORT AND RECOMMENDATION</u>

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff Patricia Shue's application for survivor's benefits on the earnings record of her deceased husband, Frank Albert Shue.

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019.  Pursuant to Fed. R. Civ. P. 25(d), he is therefore automatically substituted for Nancy A. Berryhill as the Defendant in this case.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

## I.    PROCEDURAL HISTORY

On October 9, 2014, Plaintiff filed her application for survivor's benefits. After her claim was denied, Plaintiff requested and was provided a hearing before an administrative law judge ("ALJ") on February 26, 2016. On August 10, 2016, the ALJ issued a decision in which he found Plaintiff ineligible for survivor's benefits (tr. 11–18).[2] On February 1, 2018, the Appeals Council denied Plaintiff's request for review (tr. 4–6). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).

## II.    FINDINGS OF THE ALJ

On August 10, 2016 (the date of ALJ's decision), the ALJ made several findings relative to the issues raised in this appeal (tr. 11–18):

1)    It was previously found that Plaintiff was the unmarried widow of the deceased insured wage earner;

---

[2] All references to "tr." refer to the transcript of Social Security Administration record filed on August 30, 2018 (ECF No. 15). The page numbers refer to those found on the upper right-hand corner of each page of the transcript, as opposed to page numbers appearing on other areas of the pages or those assigned by the court's electronic docketing system.

2)      Plaintiff shot the wage earner and killed him;

3)      Plaintiff filed an application for survivor's benefit on October 9, 2014;

4)      Plaintiff did not offer direct testimony at the hearing;

5)      Plaintiff was convicted of a felony for the killing of her husband;

6)      The application of the law is not limited to specific intent felony convictions;

7)      Plaintiff's actions were not lawfully justified; and

8)      Plaintiff is precluded from the receipt of survivor's benefits based on her felony conviction of Manslaughter, with the use of a firearm, of the deceased wager earner.

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); see also Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with

or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh  the  evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

IV.    FACTUAL BACKGROUND

The denial of Plaintiff's application for survivor's benefits was based on the fact that she was convicted of manslaughter in the death of the wage-earner, her husband Frank Albert Shue.   Plaintiff was tried on charges of second-degree murder and the lesser included offense of manslaughter.  On November 5, 2001, a Florida jury found Plaintiff guilty of manslaughter, with a firearm (tr. 31, 564).   On January 10, 2002, Plaintiff was sentenced to prison and was released on July 9, 2014, after which she applied for survivor's benefits (tr. 32, 41, 43).

The ALJ thoroughly reviewed the facts of the criminal case, including Plaintiff's trial, and he also reviewed Plaintiff's sworn statement, submitted in support of her claim for survivor's benefits.  The court summarizes the ALJ's findings here. On October 23, 2000, Plaintiff shot her husband, and he died shortly thereafter (tr. 12).  The evidence showed that Plaintiff was handling the gun when it was fired, striking the deceased in the abdomen at an upward trajectory, which indicated to the medical examiner that Plaintiff was sitting in a chair and shot her husband as he stood facing her (tr. 13).  Because the bullet that killed her husband was found in a chair across the room, there was some question as to whether he was actually standing at the time he was shot, although no blood was found on the chair (tr. 13).

The ALJ stated:

> [Plaintiff] told several versions of events.  Shortly after the shooting, as
> [Plaintiff] was being led out of the home, the victim reported to police
> that the shooting was an "accident," to which [Plaintiff] was reported to
> have remarked to her husband that the shooting "was no accident,"
> although not all present apparently heard her remark.   Similarly,
> [Plaintiff] testified at trial that she did not recall making such statement.
> In her statement of July 27, 2016, [Plaintiff] has since remembered
> responding to her husband, "you know it was an accident."

(Tr. 13).

Evidence also indicated that Plaintiff had been upset with her "controlling" husband in the three days that preceded the shooting (tr. 13).  There were indications that Plaintiff had planned to leave the home with a packed bag, but her departure was delayed for several days because of car trouble.  A "division of property document," evidently intended for Plaintiff and her husband, was discovered near Plaintiff's chair in the living room.  The firearm was Plaintiff's, and she normally kept it in an upstairs closet, loaded at all times.

During questioning by an investigator at the time of the crime, Plaintiff stated that she had retrieved the gun and brought it downstairs with the intention of "getting her husband's attention" (tr. 13).  Plaintiff stated she did not remember much of the circumstances surrounding the shooting, although she remembered being mad at her husband (tr. 13, 287–92).  While she admitted that she shot her husband, she stated that the shooting must have been an accident (*id*.).

At her trial, Plaintiff provided a different version of events, testifying that she had brought the gun downstairs and asked her husband to fire it to make sure it was working properly (tr. 13). Plaintiff explained that this was so they could take the gun along with them on a trip to New Orleans where they planned to attend a Tina Turner concert, although their general practice when traveling together was to take the gun belonging to her husband, a retired law enforcement officer (tr. 13, 14). Plaintiff's son also testified that his parents were planning to go to New Orleans to see the concert as a birthday present for Plaintiff (tr. 13). Although Plaintiff was found to have a packed bag of clothing in her bedroom, no packed bag was found for her husband (tr. 13).

After her husband declined to shoot the firearm, saying it would be against the law, Plaintiff testified that she laid the gun on a coffee table, and as she did so, "it just went off," shooting her husband (tr. 14).

The ALJ reviewed the expert testimony regarding the gun:

> The gun was found to be operable and not defective. It had a 7 ½-pound trigger pull, with several other safety features, precluding a "dropped gun" discharge. A gun expert, called by the defense at trial, however opined that the act of setting the gun on the table "would possibly create some unintended pressure on the trigger and the use of the trigger to control holding the weapon," which could result in an "accidental" shooting.

(Tr. 14).

Plaintiff's son, Travis Shue, testified that he was upstairs when he heard the gunshot, whereupon he rushed downstairs into the living room and observed his father on the floor in pain and his mother sitting on the edge of her chair (tr. 14).   He then grabbed her and threw her out of the chair and took possession of the gun (tr. 14, 213–14).   He then put the gun on a bed in a bedroom and called 911 (tr. 14, 214).

Next, the ALJ cited an affidavit provided years later by Travis Shue in support of Plaintiff's claim (tr. 14, 594–95).   The ALJ found that Mr. Shue's affidavit "indicated that he retrieved the gun from his mother's hand following the gunshot," and then the ALJ commented:  "The fact that the gun was still in Plaintiff's hand after the shooting is somewhat inconsistent with Plaintiff's claim that the gun just went off when she placed it on the coffee table" (tr. 14).[3]

V.    DISCUSSION

---

[3] Travis Shue actually stated that, after he entered the living room he saw his mother sitting in her chair in apparent shock, whereupon he "proceeded to take the gun from her and place it in another room while calling 911" (tr. 595).  The court does not view this statement as a definitive indication that Plaintiff was actually holding the gun in her hand, for it could also indicate merely that the gun was near her.  Nonetheless, even if Plaintiff were found not to be holding the gun upon Mr. Shue's entrance, while this would lend more support to Plaintiff's version of the facts that the gun discharged accidentally while she was laying it down, it does not disprove a finding of manslaughter, for Plaintiff certainly could have placed the gun down after shooting it.

As provided in 20 C.F.R. § 404.305(b), a person is precluded from receiving survivor's benefits from a deceased person's social security earnings if that survivor was "convicted of a felony or an act in the nature of a felony of intentionally causing that person's death."    The crux of this appeal concerns whether Plaintiff's manslaughter conviction constitutes an intentional killing as defined under this regulation, which would effectively preclude her from obtaining survivor's benefits. In construing the meaning of the word "intentional" as used in § 404.305(b), the ALJ consulted the Social Security Administration Program Operations Manual System ("POMS"), a manual that is used in evaluating Social Security claims.  While it is not binding on the SSA, the POMS is seen as persuasive authority in the agency's interpretation of its Social Security Regulations.  *See* Schweiker v. Hansen, 450 U.S. 785, 789–90, 101 S. Ct. 1468, 1471–72, 67 L. Ed. 2d 685 (1981); Davis v. Secretary of Health and Human Services, 867 F.2d 336, 340 (6th Cir. 1989); Evelyn v. Schweiker, 685 F.2d 351 (9th Cir. 1982); Ellis v. Apfel, 147 F.3d 139, 142 n.3 (2nd Cir. 1998).

The POMS defines "intent" as "[a] wish or expectancy that an act will have a certain result (regardless of the actual likelihood of such a result)."  POMS, GN 00304.060.  It further describes intent as "[t]he presence of will in the commission of

a criminal act where the individual is fully aware of the nature and probable consequences of the act that he or she plans to commit.  This applies whether the individual desires that such consequences occur or is indifferent as to their occurrence. Seldom intent is established by direct proof, but must be inferred from facts." *Id.*

The POMS provides rules for reviewing particular types of convictions to determine whether they constitute the intentional taking of life.   *Id.* at GN 00304.065B.  As it pertains to this case in particular, if the claimant was convicted of involuntary manslaughter, the POMS establishes a rebuttable presumption that there was a lack of intent.  It is noted that "[t]here is no special development required to seek evidence that rebuts a presumption." *Id.*  Conversely, if the conviction was for voluntary manslaughter, no presumption is created, "the facts relevant to the slaying must be developed" to determine if the killing was intentional, and the "decision depends on the laws of the State in which the charge is preferred." *Id.*  Where "state law does not distinguish between voluntary and involuntary manslaughter," the analysis should "follow the steps for voluntary manslaughter" – that is, observing no presumptions and developing the facts.

Florida's manslaughter statute identifies "the killing of a human being by the act, procurement, or culpable negligence of another."  Fla Stat. § 782.07.  The statute

does not facially distinguish between voluntary and involuntary manslaughter. However, caselaw in Florida draws a distinction between manslaughter by act and by procurement, which it equates to voluntary manslaughter, and manslaughter by culpable negligence, which it equates to involuntary manslaughter. Bolin v. State, 8 So. 3d 428, 430 (Fla. 2d DCA 2009). Correspondingly, Florida law designates manslaughter by act or by procurement as a crime of intent, whereas manslaughter by culpable negligence is not. Id. (citing Taylor v. State, 444 So. 2d 931, 934 (Fla. 1983)); Looney v. State, 756 So. 2d 239, 239–40 (Fla. 2d DCA 2000). The scope of that intent requirement was later refined in State v. Montgomery, 39 So. 3d 252 (Fla. 2010), which dealt with the crime of manslaughter by act. The Court there held that the statute does not require intent to kill the victim, but rather only intent to commit an act that results in death. Id. at 256–57; see also Kerney v. State, 217 So. 3d 138, 141 n.1 (Fla. 3d DCA 2017); Mueller v. State, 100 So. 3d 47, 49 (Fla. 2d DCA 2011). The court finds that, while Florida's manslaughter statute does not *facially* distinguish between voluntary and involuntary manslaughter, Florida caselaw directly draws the distinction along the lines discussed above.

In his decision, the ALJ reviewed Florida law relative to Plaintiff's manslaughter conviction and then proceeded on the assumption that Florida law does not distinguish between voluntary and involuntary manslaughter. The ALJ stated:

> When the convicting state's law does not distinguish between voluntary and involuntary manslaughter, the Agency does not presume that the slaying was intentional (POMS GN 00304.065). Instead, it develops the facts relative to the slaying and determines whether the killing was "intentional" (Id.). Since the claimant declined to testify, the undersigned relies on the facts and findings in the existing trial record, and the recent sworn statements submitted.

(Tr. 15). While the ALJ did not expressly state the holding that Florida law does not distinguish between voluntary and involuntary manslaughter, he proceeded with his analysis as if that were the case. In the paragraph immediately following the one quoted above, the ALJ discussed how the scope of Florida's manslaughter law has been held to include certain voluntary or intentional killings (tr. 15–16). The ALJ then proceeded to analyze the facts of this case with reference to culpable negligence, "the least level of intent provided by the statute," in order to demonstrate that the conviction even at its lowest level of scienter constituted an intentional killing under the SSA regulations (tr. 16). These analytic steps, coupled with the fact that the ALJ did not further raise the idea of a presumption, leads the court to fairly conclude that the ALJ did not operate under any presumption of intent during his analysis.

Plaintiff contends that the ALJ's finding of no voluntary/involuntary distinction, and therefore of no presumption under the regulations, was in error, and while the court agrees, there is also the matter of what consequence, if any, follows this error. If, as Plaintiff asserts, she was convicted of manslaughter by culpable negligence, Florida law would deem this a conviction for involuntary manslaughter, and pursuant to the POMS guidelines, a rebuttable presumption would be established that the killing was not intentional. There is some question as to whether Plaintiff was indeed convicted of manslaughter by culpable negligence, however. Defendant argues that the jury was instructed as to both manslaughter by act as well as by culpable negligence. This assertion is based on the following statement that the trial judge made to the jury while reciting the jury's instructions:

> In order to convict of manslaughter by intentional act, it is not necessary for the State to prove that the defendant had a premeditated intent to cause death.

(Tr. 549).

Defendant contends that this statement establishes that the jury was instructed on manslaughter by act and therefore could have found Plaintiff guilty of that crime. The court notes that the verdict of guilt was announced simply as for manslaughter,

without identifying whether it was by act, procurement, or culpable negligence.[4]  The court finds the above statement to be the lone reference to manslaughter by act contained within the trial judge's instructions to the jury.  Moreover, the inclusion of that particular instruction, which was taken directly from Florida's standard jury instruction for manslaughter, was contrary to its direction that the instruction be used "only if [manslaughter by act] alleged and proved, *and manslaughter is being defined as a lesser included offense of first degree premeditated murder.  See* Fla. Std. Jury Instr. (Crim.) 7.7 (2001) (italics supplied).  This makes sense, as the purpose of the instruction is to distinguish manslaughter by act, which does not require premeditation, from first degree murder, which does.  In the instant case, Plaintiff was charged with second degree murder, which also requires no premeditation and therefore renders the instruction inappropriate.[5]

---

[4]  The court finds no copy of the verdict form within the record and in the absence of such relies upon the publishing of the verdict in open court (tr. 563–64).  Plaintiff was found guilty of "manslaughter, a lesser included offense with a firearm" (tr. 564).  According to Defendant, the "with a firearm" language in the verdict signifies even further that Plaintiff's conviction constituted an intentional crime, but the court does not agree.  The inclusion of the firearm in the verdict was in response to a separate, secondary question on the verdict form, to be answered evidently for purposes of enhancement of the sentence only if the jury had first found Plaintiff guilty of either second degree murder or manslaughter (tr. 549, 555).  The matter of the firearm therefore had no bearing on the question of intent as it related to the jury's verdict of manslaughter.

[5]  The judge also specifically instructed the jury that for second degree murder "it is not necessary for the State to prove the defendant had a premeditated intent to cause death" (tr. 547).

Thus, the statement in question is best viewed as an erroneously inserted instruction that bore no logical connection to the rest of the instructions to the jury. Indeed, when the jury was being instructed as to the actual elements needed to prove that Plaintiff was guilty of manslaughter, the judge stated: "Before you can find the defendant guilty of manslaughter the State must prove the following two elements beyond a reasonable doubt.  No. 1, Frank Shue is dead.  No. 2, the death of Frank Shue was caused by *the culpable negligence of* [Plaintiff] Patricia Shue" (tr. 547–48) (italics supplied).  By contrast, the statement regarding manslaughter by act sets out no elements of proof.  It does not instruct the jury as to how it might find Plaintiff guilty of manslaughter by act; it only references one thing that is *not* required. Accordingly, Defendant's argument that the jury was instructed on manslaughter by act is without merit.

It is therefore clear that Plaintiff was found guilty of manslaughter by culpable negligence, which under Florida law is identified as involuntary manslaughter and not a crime of intent.  As such, the POMS guidelines would direct that a rebuttable presumption be applied that Plaintiff's killing of her husband was not intentional under SSA regulations.  Although the ALJ did evaluate Plaintiff's conviction with reference to culpable negligence ("the least level of intent provided by the statute")

and found that the crime equated to an intentional killing under SSA regulations (tr.

16), he observed no rebuttable presumption during the analysis.

The ALJ's finding in this regard is fairly seen to contravene the POMS

procedure.  Nonetheless, this violation is of not of ultimate consequence.  While the

POMS has persuasive value, its regulations and procedures are not products of formal

rulemaking.  Wash. State Dep't of Soc. & Health Servs. v. Keffeler, 537 U.S. 371,

385, 123 S. Ct. 1017, 1026, 154 L. Ed. 2d 972 (2003).[6]  Thus, while the POMS

---

[6] In American Trucking Association, Inc. v. United States, the Eleventh Circuit more fully
explained the dividing line between legislative rules that have the force of law and nonlegislative
rules that do not:

> Legislative rules are those that are promulgated pursuant to a Congressional
> delegation of power to issue rules and regulations that have the force of law.  Valid
> legislative rules are binding on the courts because they are the source of law that the
> court and agency must enforce.  Legislative rules are valid unless "arbitrary,
> capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C.
> s 706(2)(A).  Not all rules are of a legislative character, however.  See the broad
> definition of "rule" in 5 U.S.C. s 551(4). Nonlegislative rules are those not
> promulgated pursuant to a power to issue regulations with binding effect; they are
> merely an expression of how the agency interprets and intends to enforce its
> governing statute, how it intends to exercise a discretionary function, or the
> procedure an agency intends to use in exercising its powers.  Nonlegislative rules do
> not have the same binding effect on the courts because they do not form the law
> which the courts enforce; the statute remains the source of the law.  In the case of
> interpretative nonlegislative rules,  that is, rules that give the agency's opinion as to
> what the governing statute means, the rules are advisory only and the court is free to
> substitute its own judgment for that of the agency.  5 U.S.C. s 706 ("the reviewing
> court shall decide all relevant questions of law (and) interpret statutory provisions").
> Courts frequently, however,  give great deference to an agency's nonbinding
> interpretative rules, upholding the rules if they are reasonable and consistent with
> past decisions.  Thus, in practice it is often difficult, and frequently unnecessary, to
> determine which standard of review a court is applying.

"warrant[s] respect," *id.*, it does not have the force of law.  *See* Stroup v. Barnhart, 327

F.3d 1258, 1262 (11th Cir. 2003); Smith v. Comm'r of Soc. Sec., 743 F. App'x 951,

954 n.1 (11th Cir. 2018); Rodriguez v. Comm'r of Soc. Sec., 737 F. App'x 514, 517

(11th Cir. 2018); Wells v. Comm'r of Soc. Sec., 430 F. App'x 785, 786–87 (11th Cir.

2011).  Accordingly, in reviewing the Commissioner's decision, the court need not

consider whether the ALJ's analysis complied with the guidelines in the POMS.  *See*

Wells,  430 F. App'x at 787 (holding that "because the POMS does not have the force

of law and a violation of the SSA's internal guidelines does not entitle [the claimant]

to the relief she seeks, we need not address whether the Commissioner adhered to the

POMS"); *see also* Barron v. Sullivan, 924 F.2d 227, 229 (11th Cir. 1991) (finding in

social security disability case that "[t]he POMS directives are useful in considering

the unique situation presented . . . but [what] must be demonstrably met or equaled

remains [what is] listed in [the Code of Federal Regulations].  The facts and the law

meet under the [CFR] Listings, not under POMS."); Martin v. Soc. Sec. Admin.,

Comm'r, 903 F.3d 1154, 1162 & n.52 (11th Cir. 2018) (finding that the POMS

regulations are per se unentitled to deference under Chevron, U.S.A., Inc. v. National

---

Am. Trucking Ass'n, Inc. v. United States, 688 F.2d 1337, 1341–42 (11th Cir. 1982) (footnotes and
some citations omitted), *rev'd sub nom.*, I.C.C. v. Am. Trucking Associations, Inc., 467 U.S. 354,
104 S. Ct. 2458, 81 L. Ed. 2d 282 (1984).

Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984), a case in which the Supreme Court set out a test by which courts should determine whether deference should be afforded to an agency's interpretation of an ambiguous statute).

In so stating, the court recognizes that, at its core, the ALJ's error was not in misconstruing the POMS guidelines, but rather that while implementing those guidelines the ALJ mistakenly found that the Florida manslaughter statute did not draw a distinction between voluntary and involuntary manslaughter.  In other words, it was not an error of interpreting the SSA standards but of Florida law.  Nonetheless, the error's only bearing on the ALJ's analysis was in how it affected the question of whether a POMS presumption should apply.  Thus, the only byproduct of the ALJ's error was in how it might have caused him to stray from the POMS procedure—and, again, whether the ALJ adhered to that procedure while analyzing the intent issue is not relevant to this court's review.

Nonetheless, the court must still determine whether the ALJ's decision comported with the applicable legal standards and was supported by substantial evidence.  The ALJ essentially found the crime of manslaughter by culpable

negligence to fairly encompass an intentional act or killing as defined under the SSA

regulations.

In his survey of Florida law, the ALJ stated:

Although the Florida law does not define culpable negligence, Florida courts have consistently defined culpable negligence under the manslaughter statute as: (1) gross and flagrant character, evincing reckless disregard of human life or safety of persons exposed to its dangerous effects; (2) the entire want of care which would raise a presumption of indifference to consequences; (3) such wantonness or recklessness or gross careless disregard of safety and welfare of the public; or (4) the reckless indifference to the rights of others, which is equivalent to an intentional violation of them. United States v. Chan-Gutierrez, 368 Fed. Appx. 536, 538 (5th Cir. March 2, 2010) (citing *Hunt v. State*, 87 So. 2d 584, 585 (Fla. 1956); *Maxey v. State*, 65 So. 2d 677, 678 (Fla. 1954); *Walter v. State*, 157 Fla. 684, 26 So. 2d 821 (Fla. 1946); *Brinkley v. State*, 874 So. 2d 1199 (Fla. Dist. Ct. App. 2004)).

The courts have noted, "Florida has defined culpable negligence to involve a state of mind so wanton or reckless that the behavior it produces may be regarded as intentional." *Charlton v. Wainwright*, 588 F.2d 162, 164 (5th Cir. 1979). The jury herein was so charged (Ex. 2[3], pp. 68–69) [tr. 548–49]. *State v. Montgomery*, 39 So. 3d 252, 256 (Fla. 2010), makes clear that intent to kill is not required to prove the act of manslaughter; it does not state whether recklessness as to the risk of death is required. The silence as to recklessness in *Montgomery* leaves undisturbed a line of cases stretching back over one hundred years, which have held that unexpected deaths caused by intended acts, can be enough to prove manslaughter. As the trial judge charged, "culpable negligence is consciously doing an act or following a course of conduct that the defendant must have known or reasonably should have known was likely to cause death or great bodily injury" (Ex. 23, p. 69) [tr. 549].

(Tr. 16).

As the comments above show, the ALJ recognized that manslaughter by culpable negligence is defined under Florida law in such a manner as to qualify as an intentional act.  Further, the same recklessness as to the risk of death that is sufficient under the manslaughter statute (and as instructed by the trial judge (tr. 548)) is sufficient under the SSA regulations to qualify as intentional.  As the ALJ further noted (tr. 16), the only apparent trial defense to the criminal charge against Plaintiff was that her husband's death was the result of an accident caused by her placing the gun on the table—a defense that the jury clearly rejected.  Given the evidence adduced at trial, and recounted by the ALJ, and given the fact that culpable negligence under Florida law fairly encompasses intentional acts, the ALJ's decision was in line with the applicable legal standards and was supported by substantial evidence.  *See* <u>Davis</u>, 867 F.2d at 340–41 (affirming ALJ's decision to deny benefits "because [the claimant's] second-degree manslaughter conviction [fell] within the regulation's definition of an intentional homicide").

In arguing to the contrary, Plaintiff highlights some of the evidentiary points that the ALJ emphasized, such as evidence tending to show that Plaintiff had been upset with her "controlling" husband in the days preceding the shooting; that Plaintiff intended to leave the home with a packed bag; and that a division of property

document had been prepared.  Plaintiff contends that, by pointing out this evidence, "the ALJ has tried to make out a case for a murder conviction, when in fact the jury rejected this charge.  Had the jury accepted the evidence relied on by the ALJ, its duty would have been to convict Ms. Shue of murder" (ECF No. 19 at 15).  The court does not see the logic in that contention.  While it is true that the above evidence could be viewed by the jury as probative of murder, it is not to the exclusion of manslaughter. The emotional flashpoints that the above evidence suggests could have resulted in Plaintiff forming an intent to shoot and kill her husband, and therefore be guilty of murder, but it could also have spurred her into the sort of reckless behavior or disregard for the safety of others that forms the basis for a conviction of manslaughter by culpable negligence.  Plaintiff's contention is therefore unavailing.

Last, Plaintiff cites the POMS guidelines wherein three exceptions to the definition of intentional homicide are set out:

Exclude the following cases from intentional homicide:

• Homicides which are the result of an accident;

• Homicides where the killing is the result of self-defense; or

• Homicides where the claimant was insane, or under the influence of drugs or alcohol (to the extent that he or she was unaware of the nature and consequences of the act) when he or she killed the [wage earner].

POMS, GN 00304.065A.

Plaintiff asserts that the ALJ failed to properly consider the applicability of the intoxication exception to her case. Since this claim concerns the application of a POMS guideline, it is also subject to the holding earlier discussed that the POMS does not have the force of law and failure to abide by its guidelines is not grounds for reversal. *See, e.g.,* Wells, *supra*.

The court nonetheless notes that the ALJ addressed this claim, finding that the evidence of Plaintiff's intoxication was not at such a level that Plaintiff was "unaware of the nature and consequences of her actions" (tr. 17). Plaintiff points to evidence from her son Travis Shue who testified that she had been drinking on the day of the shooting and, although he was not sure, she appeared to be drunk (tr. 215–16). Mr. Shue also stated that Plaintiff had been drinking more than normal during the six months that preceded the incident (tr. 216). In his affidavit filed years later, Mr. Shue stated that he knew Plaintiff to be taking Xanax on a regular basis at the time, and that on the date of the incident he personally observed his mother drinking wine from a large jug "as was normal for her during this period of her life" (tr. 594). He also provided that he noticed his mother was "very intoxicated" and had "slurred speech" on the day in question (tr. 595). In Plaintiff's affidavit she also stated that she was

taking Xanax daily at this time and also that on a daily basis she consumed large amounts of wine to the point that she became intoxicated (tr. 597).

The court finds the ALJ's decision to be substantially supported; although Plaintiff proffers evidence to say she would have been intoxicated on the day in question, there is no substantial evidence to indicate that she was intoxicated to the point that she would not be cognizant of the nature or consequences of her actions.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED**:

That the clerk of court is directed to substitute Andrew Saul for Nancy A. Berryhill as Defendant.

And it is respectfully **RECOMMENDED**:

1.    That the decision of the Commissioner be **AFFIRMED**, and that this action be **DISMISSED**.

2.      That **JUDGMENT** be entered, pursuant to sentence four of 42 U.S.C. §

405(g), **AFFIRMING** the decision of the Commissioner.

3.      That the Clerk be directed to close the file.

At Pensacola, Florida this 23rd day of July 2019.


                           /s/ *Elizabeth M. Timothy*
                           **ELIZABETH M. TIMOTHY**
                           **CHIEF UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**